1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                          EASTERN DISTRICT OF CALIFORNIA

8

9   NATHAN CAETANO,                          Case No.  1:15-cv-00832-LJO-MJS (HC)

10              Petitioner,                   **ORDER DENYING AS MOOT MOTION FOR EXPEDITED REVIEW (ECF NO. 57)**

11        v.
                                             **ORDER GRANTING MOTION FOR RULING (ECF NO. 68)**
12  MICHAEL SEXTON, Acting Warden

13              Respondent.
                                             **FINDINGS AND RECOMMENDATIONS TO:**
14
                                             **(1)  GRANT RESPONDENT'S MOTION TO
15                                            DISMISS (ECF NO. 45);**

16                                           **(2) DISMISS THE PETITION AS TIME-
                                             BARRED;**
17
                                             **(3) DENY PETITIONER'S MOTIONS FOR
18                                           APPOINTMENT OF COUNSEL (ECF NOS.
                                             49, 50, 51, 54);**
19
                                             **(4) DENY PETITIONER'S MOTIONS FOR
20                                           APPOINTMENT OF EXPERTS (ECF NOS. 50,
                                             53);**
21
                                             **(5) DENY PETITIONER'S MOTION FOR
22                                           TRANSCRIPTS (ECF NO. 51);**

23                                           **(6) DENY PETITIONER'S MOTION FOR
                                             DEFAULT JUDGMENT (ECF NO. 62); AND**
24
                                             **(7) DENY PETITIONER'S MOTIONS FOR
25                                           EVIDENTIARY HEARING (ECF NOS. 66, 69)**

26
                                             **THIRTY (30) DAY OBJECTION DEADLINE**
27

28

1      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

2 corpus under 28 U.S.C. § 2254. Michael Sexton, Acting Warden of California State

3 Prison – Corcoran, is hereby substituted as the proper named respondent pursuant to

4 Rule 25(d) of the Federal Rules of Civil Procedure. Respondent is represented by Tami

5 M. Krenzin of the Office of the California Attorney General.

6      Before the Court is Respondent's renewed motion to dismiss the petition as time-

7 barred. (ECF No. 45.) The Court has already determined that the petition was not timely

8 filed within the one-year limitations period set out in 28 U.S.C. § 2244(d). (ECF Nos. 31,

9 41.) The only question now before the Court is whether Petitioner is entitled to equitable

10 tolling. For the reasons stated below, the Court concludes that he is not. Accordingly, the

11 undersigned will recommend that the motion to dismiss be granted and that the petition

12 be dismissed.

13      Also before the Court are several motions filed by Petitioner: four motions for the

14 appointment of counsel (ECF Nos. 49, 50, 51, 54), two motions for the appointment of

15 experts (ECF No. 50, 53), a motion for transcripts (ECF No. 51), a motion for expedited

16 review (ECF No. 57), a motion for default judgment (ECF No. 62), two motions for an

17 evidentiary hearing (ECF Nos. 66, 69), and a motion for ruling on his previously filed

18 motions (ECF No. 68). These motions also are addressed herein.

19 **I.    Procedural History**

20      Petitioner is currently in the custody of the California Department of Corrections

21 pursuant to a judgment of the Superior Court of California, County of Kings, upon

22 pleading to second degree murder on May 18, 2011. (See Lodged Doc. No. 1.) On June

23 16, 2011, Petitioner was sentenced to an indeterminate state prison term of fifteen years

24 to life. (Id.)

25      Petitioner did not appeal his conviction. However, Petitioner filed three post-

26 conviction collateral challenges regarding his conviction[1]:

27 _____

28 [1] Under the mailbox rule, the Court deems petitions filed on the date Petitioner handed a petition to prison authorities for mailing. Houston v. Lack, 487 U.S. 266, 276, 108 S.Ct. 2379, 2385, 101 L. Ed. 2d 245

1

2          1.    <u>California Court of Appeal, Fifth Appellate District</u>
                 Filed: November 12, 2014;
3                Denied: December 5, 2014;

4          2.    <u>California Supreme Court</u>
                 Filed: December 14, 2014;
5                Denied: January 7, 2015;

6          3.    <u>California Supreme Court</u>
                 Filed: January 15, 2015;
7                Denied: April 29, 2015;

8    (<u>See</u> Lodged Docs. 2-7.)

9          On May 19, 2015, Petitioner filed the instant federal petition for writ of habeas

10   corpus in this Court. On September 14, 2015, Respondent filed a motion to dismiss the

11   petition as being filed outside the one-year limitations period prescribed by 28 U.S.C.

12   § 2244(d). (ECF No. 20.) Petitioner filed an opposition to the motion alleging that he was

13   entitled to an equitable exception to the statute of limitations based on his actual

14   innocence. (ECF No. 23.) On September 30, 2015, the Court issued findings and

15   recommendations to dismiss the petition as untimely. (ECF No. 24.) Petitioner filed

16   objections, which included hundreds of pages of argument and exhibits. (ECF Nos. 25-

17   26.) The objections alluded to significant issues with Petitioner's mental stability, and

18   therefore raised the question of whether Petitioner is entitled to equitable tolling based

19   on his mental impairment and/or whether the Court should inquire further in this regard,

20   including possibly holding an evidentiary hearing, prior to making a determination.

21         Accordingly, on August 25, 2016, the Court vacated its prior findings and

22   recommendations and issued new findings and recommendations to deny the motion to

23   dismiss without prejudice. (ECF No. 31.) Therein, the Court rejected Petitioner's actual

24   innocence claim, but concluded that the record was insufficiently developed to make a

25   determination as to whether Petitioner is entitled to equitable tolling on the basis of

26

27   (1988); <u>Campbell v. Henry</u>, 614 F.3d 1056 (9th Cir. 2010); see also Rule 3(d) of the Rules Governing
     Section 2254 Cases. Here, the Court considers the petitions filed on the date they were signed by
28   Petitioner.

                                              3

mental impairment. The Court recommended that Respondent be permitted to file a renewed motion to dismiss based on the statute of limitations upon an expanded record. Alternatively, Respondent could address Petitioner's claims on the merits. (Id.)

The findings and recommendations were adopted on February 8, 2017. (ECF No. 41.) Respondent's renewed motion to dismiss followed on May 5, 2017. (ECF No. 45.) Petitioner filed an opposition. (ECF No. 52.) He then filed an "addendum rebuttal" to the motion. (ECF No. 62.) Respondent filed a reply. (ECF No. 63.) Petitioner filed a sur-reply. (ECF No. 67.) Additionally, as discussed above, Petitioner has filed numerous other motions. (ECF Nos. 49, 50, 51, 53, 54, 57, 62, 66, 68, 69.) Respondent has replied to a majority of these motions, and the time for replying to the remaining motions has passed. (ECF Nos. 63.) These matters are submitted.

## II. Motion to Dismiss

### A. Procedural Grounds for Motion to Dismiss

Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a petition if it "plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court . . . ." Rule 4 of the Rules Governing Section 2254 Cases.

The Ninth Circuit has allowed respondents to file a motion to dismiss in lieu of an answer if the motion attacks the pleadings for failing to exhaust state remedies or being in violation of the state's procedural rules. See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990) (using Rule 4 to evaluate motion to dismiss petition for failure to exhaust state remedies); White v. Lewis, 874 F.2d 599, 602-03 (9th Cir. 1989) (using Rule 4 as procedural grounds to review motion to dismiss for state procedural default); Hillery v. Pulley, 533 F.Supp. 1189, 1194 & n. 12 (E.D. Cal. 1982) (same). Thus, a respondent can file a motion to dismiss after the court orders a response, and the Court should use Rule 4 standards to review the motion. See Hillery, 533 F. Supp. at 1194 & n. 12.

4

In this case, Respondent's motion to dismiss is based on a violation of the one-year limitations period. 28 U.S.C. § 2244(d)(1). Because Respondent's motion to dismiss is similar in procedural standing to a motion to dismiss for failure to exhaust state remedies or for state procedural default and Respondent has not yet filed a formal answer, the Court will review Respondent's motion to dismiss pursuant to its authority under Rule 4.

### B.    Commencement of Limitations Period

The instant petition was filed after April 24, 1996 and is subject to the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"). Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). AEDPA imposes a one-year period of limitation on petitioners seeking to file a federal petition for writ of habeas corpus:

> (1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Under § 2244(d)(1)(A), the limitations period begins running on the date that the

petitioner's direct review became final or the date of the expiration of the time for seeking such review.[2] In this case, Petitioner did not appeal the judgment issued on June 16, 2011. Accordingly, his conviction became final 60 days later, on August 15, 2011. Cal. Rules of Court 8.308(a); <u>Mendoza v. Carey</u>, 449 F.3d 1065, 1067 (9th Cir. 2006). The AEDPA statute of limitations began to run the following day, on August 16, 2011. <u>Patterson v. Stewart</u>, 251 F.3d 1243, 1246 (9th Cir. 2001).

### C.     Statutory Tolling

28 U.S.C. § 2244(d)(2) states that the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the one year limitations period. Here, however, Petitioner did not file any post-conviction challenges to the judgment during the one year limitations period. While Petitioner filed three post-conviction challenges starting in November 2014, petitions filed after the expiration of the statute of limitations period have no tolling effect. <u>Ferguson v. Palmer</u>, 321 F.3d 820, 823 (9th Cir. 2003) (petitions filed after the limitations period expires do not toll the statute of limitations); <u>Jimenez v. Rice</u>, 276 F.3d 478, 482 (9th Cir. 2001) (same). Therefore, statutory tolling in inapplicable; the limitations period commenced on August 16, 2011 and expired on year later on August 15, 2012. The instant petition was filed on May 19, 2015, over two years later. Absent equitable tolling or the application of an equitable exception, the petition is untimely.

### D.     Equitable Tolling Based on Mental Impairment

#### 1.     Applicable Law

The limitations period is subject to equitable tolling if the petitioner demonstrates: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." <u>Holland v. Florida</u>, 130 S. Ct. 2549, 2560-62 (2010) (quoting <u>Pace v. DiGuglielmo</u>, 544 U.S. 408 (2005)). Petitioner bears the burden of

---

[2] The limitations period may begin running later under certain specified circumstances, none of which are applicable here. 28 U.S.C. § 2244(d)(1)(B)-(D).

alleging facts that would give rise to tolling. <u>Pace</u>, 544 U.S. at 418; <u>Hinton v. Pac. Enters.</u>, 5 F.3d 391, 395 (9th Cir. 1993). The Ninth Circuit has determined that mental incompetence can represent an extraordinary circumstance that serves as a basis for equitable tolling under AEDPA. <u>See</u> <u>Orthel v. Yates</u>, 795 F.3d 935, 938-41 (9th Cir. 2015); <u>Bills v. Clark</u>, 628 F.3d 1092, 1100 (9th Cir. Cal. 2010); <u>Laws v. Lamarque</u>, 351 F.3d 919, 923 (9th Cir. 2003). Whether mental illness warrants tolling depends on whether the petitioner's mental illness during the relevant time "constituted the kind of extraordinary circumstances beyond his control, making filing impossible, for which equitable tolling is available." <u>Laws</u>, 351 F.3d at 922-23. The Ninth Circuit has explained that eligibility for equitable tolling due to mental impairment requires the petitioner to meet a two-part test:

> (1) *First*, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control, by demonstrating the impairment was so severe that either
>
> > (a) petitioner was unable rationally or factually to personally understand the need to timely file, or
> >
> > (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing.
>
> (2) *Second*, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.
>
> To reiterate: the "extraordinary circumstance" of mental impairment can cause an untimely habeas petition at different stages in the process of filing by preventing petitioner from understanding the need to file, effectuating a filing on his own, or finding and utilizing assistance to file. The "totality of the circumstances" inquiry in the second prong considers whether the petitioner's impairment was a but-for cause of any delay. Thus, a petitioner's mental impairment might justify equitable tolling if it interferes with the ability to understand the need for assistance, the ability to secure it, or the ability to cooperate with or monitor assistance the petitioner does secure. The petitioner therefore always remains accountable for diligence in pursuing his or her rights.

<u>Bills</u>, 628 F.3d at 1099-1100 (internal citations and footnote omitted). Therefore, in order to evaluate whether a petitioner is entitled to equitable tolling, a district court should:

> (1) find the petitioner has made a non-frivolous showing that he had a

severe mental impairment during the filing period that would entitle him to an evidentiary hearing; (2) determine, after considering the record, whether the petitioner satisfied his burden that he was in fact mentally impaired; (3) determine whether the petitioner's mental impairment made it impossible to timely file on his own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise diligent in attempting to comply with the filing requirements.

Id. at 1100-01.

If the petition or the record contains some evidence of a period of mental incompetency, courts have generally required further factual development of the record. See Laws, 351 F.3d at 923-24 (describing extended incompetency evaluations at petitioner's trial); Rohan ex rel. Gates v. Woodford, 334 F.3d 803, 814 (9th Cir. 2003) (describing a record documenting "serious mental problems for many years"). On the other hand, where a prisoner fails to show "any causal connection" between the grounds upon which he asserts a right to equitable tolling and his inability to timely file a federal habeas application, the equitable tolling claim will be denied. Gaston v. Palmer, 417 F.3d 1030, 1034 (9th Cir. 2005) (not clear error to find equitable tolling inapplicable where prisoner fails to show causal connection between physical and mental disabilities and inability to timely file petition.). Also, "[w]here the record is amply developed, and where it indicates that the petitioner's mental incompetence was not so severe as to cause the untimely filing of his habeas petition, a district court is not obligated to hold evidentiary hearings to further develop the factual record, notwithstanding a petitioner's allegations of mental incompetence." Orthel, 795 F.3d at 939-940 (citing Roberts v. Marshall, 627 F.3d 768, 773 (9th Cir. 2010)). Thus, a district court's review of a petitioner's mental health records for the time period in question may be sufficient to make a determination on equitable tolling. See Roberts, 627 F.3d at 773 (district court's review of the petitioner's "extensive medical records" was an amply developed record upon which district court could find an evidentiary hearing unnecessary); Taylor v. Filson, No. 16–15426, 2017 WL 2684132, at *1 (9th Cir. June 21, 2017) (district court's review of the petitioner's medical records sufficient to conclude equitable tolling not warranted based

on the petitioner's mental health) (citing <u>Orthel</u>, 795 F.3d at 939, and <u>Bills</u>, 628 F.3d at 1100).

## 2.  Petitioner's Mental Health Records

The Court initially raised questions regarding Petitioner's potential mental impairment based primarily on records submitted by Petitioner concerning his mental status during the period preceding the start of the limitations period. (ECF No. 31 at 9-10.) However, in determining whether Petitioner is entitled to equitable tolling, the Court is primarily concerned with Petitioner's status and conduct *during* the limitations period. <u>Orthel</u>, 795 F.3d at 938 (focusing inquiry on the time during which the limitations period ran); <u>see also</u> <u>Laws</u>, 351 F.3d at 923 (competence to stand trial not determinative of tolling issue). Respondent has now provided the Court with Petitioner's complete mental health record from the California Department of Corrections and Rehabilitation ("CDCR"). (<u>See</u> ECF No. 46.) Accordingly, the Court will review it in detail to see whether or not it is sufficient, on its own, to indicate whether petitioner's mental impairment was so severe as to be the but-for cause of the untimely filing of his habeas petition. <u>Orthel</u>, 795 F.3d at 939-940. Although the limitations period is the focus of Petitioner's claim to equitable tolling, the Court also will review the records preceding and following the limitations period for context.

### a.  Prior to Commitment to CDCR

The records submitted by Petitioner reflect the following regarding Petitioner's mental health prior to his conviction:

Petitioner has a mental health history dating back to at least 2003. (<u>See</u> ECF No. 25-1 at 1.) In February 2004, he was admitted to Kings County Mental Health with a lengthy history of methamphetamine use and symptoms of paranoia, visual and auditory hallucinations, and other psychotic symptoms. (<u>Id.</u> at 2-3.) As relevant here, he was diagnosed with psychotic disorder secondary to psychostimulant use and mood disorder secondary to methamphetamine abuse and withdrawal. He was treated with medication

and released. Over the ensuing years, Petitioner had various contacts with law enforcement and mental health providers, some related to substance use and/or psychotic symptoms, and others related to a domestic matter. (Id. at 7-24, 42.) The incident at issue in the instant case occurred in November 2009, when Petitioner killed his father in his father's barn and set the barn on fire. (See ECF No. 1 at 7.)

During the pendency of the criminal proceedings at issue here, Petitioner had numerous mental health visits. Almost a year before the limitations period commenced, and prior to Petitioner's plea, Dr. Frank Wilson of the California Forensic Medial Group drafted a progress note after Petitioner failed to meet with him on October 8, 2010. Wilson stated, "I called this a psychotic disorder in the past. I think that it probably still is. I think that it is a probably a chronic schizophrenic process." (ECF No. 25-1 at 80.) Wilson recommended continued medication and visits. (Id.)

The next week, Wilson made the following notes upon visiting with Petitioner:

> S: He missed his 90-day follow-up last week and today was smiling about it like a cat caught with a canary. This is a man who allegedly killed his father in the father's barn and then set the barn on fire. Realizing then that he had marijuana in there, he went in and tried to get the marijuana out. He is facing arson and murder. Looking at him, you would not tell that he is facing this. Inappropriate smiling. I strongly suspect that he was psychotic at the time of the commission of this crime. He has been down since November of last year so he is working up to a year. He was not in any position to tell us where the case was going, mainly because I do not think he was aware.
>
> O: His examination was otherwise benign. He clearly had an inappropriate affect and diminished verbal output but was not hostile. I could not tell whether he was responding to internal stimuli or not.
>
> A: The diagnosis is certainly chronic paranoid schizophrenia.

(Id. at 81.) When seen on January 21, 2011, Wilson noted that Petitioner was "surprisingly blasé, laughing almost inappropriately at times" but also found that there was "no evidence of the psychotic process that we saw earlier." (ECF No. 25-1 at 82.) It was again noted on April 15, 2011 that Petitioner was "carrying a diagnosis of paranoid type schizophrenia." (Id. at 84.) No further records are available for the period preceding Petitioner's conviction.

## b.     During Limitations Period

As stated above, the judgment in this case was entered on June 16, 2011, and the limitations period ran from August 16, 2011 through August 15, 2012. CDCR mental health records from this period reflect the following.

- The first mental health visit reflected in the records provided by Respondent occurred on July 20, 2011, shortly before the commencement of the limitations period. At that time, Petitioner stated his mood was "fine," and he claimed he had no symptoms of mania, psychosis, or suicidal or homicidal ideations. He was satisfied with his medications. The evaluation was unremarkable. He was diagnosed with mood disorder, not otherwise specified. His medications were continued and he was recommended for a three month follow-up. (Lodged Doc. 8 at 1.)

- The next visit occurred on December 20, 2011, when Petitioner was transferred to North Kern State Prison. It was noted that Petitioner was alert, oriented, calm, had normal speech and motor skills, had coherent thought processes, and did not have any hallucinations. However, he was noted to have paranoid delusions and was referred for further evaluation. (Id. at 3-6.)

- On December 28, 2011, Petitioner was placed in the Mental Health Services Delivery System at the CCCMS Level of Care[3] for "stabilization and monitoring." His Global Assessment of Functioning ("GAF")[4] score was assessed to be 55. His mental status examination was largely within normal limits. However, he had an incongruent affect and loose, circumstantial, and paranoid thought processes. His

[3] CCCMS stands for Correctional Clinical Case Management Services, which is the lowest of the four levels of care within the prison system's Mental Health Services Delivery Program. Coleman v. Schwarzenegger, 922 F.Supp.2d 882, 903 (E.D. Cal. 2009). "The CCCMS level of care is for inmates whose symptoms are under control or in partial remission and can function in the general prison population, administrative segregation, or segregated housing units." Id. at 903 n.24.

[4] "Global Assessment of Functioning," is a scale used by clinicians to assess an individual's overall level of functioning, including the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed. 2004) ("DSM IV-TR"). The significance of this score is discussed further below.

insight and judgment were poor and he had auditory hallucinations in which he heard his father's voice wanting vengeance. As strengths, the clinician noted, "Verbal; able to advocate for self; open to MH treatment." His behavior control was mildly impaired and his mental illness symptoms were moderate. He had no impairment in the areas of work/school, activities of daily living, medical, or interpersonal. (Id. at 7-15.)

- On January 3, 2012, Petitioner underwent mental health and developmental disability screening at Wasco State Prison. His adaptive functional assessment was poor. His functioning was noted to be "NCF" (Normal Cognitive Functioning), which indicates that Petitioner did not require adaptive support services to function in the institutional setting. He was referred for further evaluation. (Id. at 18-22.)

- Petitioner's next evaluation occurred on January 30, 2012. He reported that he was "alright," denied "psych" symptoms, and reported no recent voices while taking medication. He stated he was "a little depressed." His thought process was linear and logical and he demonstrated no psychosis. His GAF score was 60. He was retained at the CCCMS level of care and his medications were continued. (Id. at 25-26.)

- On February 6, 2012, Petitioner underwent another mental health evaluation. He was noted to be calm and cooperative and answered all questions appropriately. His appearance, behavior, cooperation, orientation, speech, affect, and mood were within normal limits. He reported a manic episode a couple of weeks prior, and auditory hallucinations "not too long ago." He reported ongoing mood swings with intense highs, suggesting a diagnosis of Schizoaffective Disorder, Bipolar Type. His functional impairment was assessed as moderately impaired with regard to work/school, interpersonal matters, and mental illness symptoms; severely impaired with regard to behavior control; and mildly impaired with regard

to activities of daily living. His GAF score was 55. He was continued at the CCCMS Level of Care. (Id. at 28-45.)

- On February 28, 2012, Petitioner reported that everything was "going alright," his mood was "alright" and he had no psychotic symptoms or voices for one month. His GAF score was 65. The clinician noted that Petitioner was content with his treatment, stable, and thankful and hopeful for the future. (Id. at 46.)

- On March 5, 2012, Petitioner was seen for his monthly CCCMS follow up. He stated he had been doing alright and had no specific concerns. He reported reading a lot and communicating with his family. He denied recent perceptual disturbances, but reported auditory hallucinations two weeks prior. There was no indication of delusions or paranoia. His GAF score was 60. (Id. at 47-48.)

- Petitioner was evaluated on March 20, 2012 and his mental health status had declined. He reported hearing voices and feeling depressed and hopeless. He denied mood swings. His GAF score was 45. (Id. at 50.)

- On March 29, 2012, Petitioner was interviewed in relation to a recent RVR for battery on an inmate relating to a recent fight on the yard. He presented with intact cognitive and behavioral skills and normal speech and prosody. He denied current auditory hallucinations. He exhibited no psychosis or delusions. His GAF score was 65. (Id. at 51.)

- Petitioner was next seen on May 25, 2012, almost two months later. He reported that he was depressed, experienced mood swings, and heard voices occasionally. His insight and judgment were limited and his ability to be a reliable historian was questionable. Petitioner's cognition was impaired as to processing, attention, and social situations, but not with respect to memory, learning ability/skills, reasoning, or problem solving. He was cooperative, maintained good eye contact, his speech and tone were normal, he had linear and logical thought processes, his thought content was without psychosis or delusions, his affect was

appropriate and effective communication was achieved. His GAF score was nonetheless 45. (Id. at 52-53.)

- On June 21, 2012, Petitioner underwent an initial intake at High Desert State Prison. He reported that he stopped taking his medication due to "yard politics" at new institution. The clinician noted that a possible transition to a Level III yard would make him more comfortable taking medication: "White gang politics do not allow I/P to take psychotropic meds he may need." Petitioner was oriented, his speech was normal, his insight and judgment were fair, and his mood and thought processes were within normal limits. He was not experiencing hallucinations, delusions, obsessions, or magical thinking. However, other aspects of Petitioner's mental status were deemed "difficult to evaluate." His GAF score was 58. (Id. at 54-69.)

- Petitioner was seen again on June 27, 2012. The provider noted that Petitioner's head was stiff and he seldom made eye contact. Petitioner stated that he was alright, did not want medication, and would be alright. He stated he did not know if politics would permit him to take medication on the Level III yard. The provider noted that, when Petitioner did talk, it was appropriate. His affect was odd but he did smile. (Id. at 73.)

- Petitioner underwent a psychiatric evaluation on July 2, 2012. Petitioner stated that he was doing alright. He continued to refuse medication due to prison politics. He reported doing fine off medication with the exception of some difficulty sleeping. He denied auditory or visual hallucinations. He reported last hearing auditory hallucinations roughly one year prior. His thought process was linear, logical, and goal directed. His insight and judgment were fair. His GAF score was 58. (Id. at 74-75.) ,

- On July 5, 2012, Petitioner was seen in relation to an Interdisciplinary Treatment Team ("IDTT") meeting. Petitioner reported that he had not experienced

hallucinations in quite a while and asked to be off medications. He was calm, with limited verbiage, but the exam was otherwise unremarkable. He had a mildly blunted affect but his process was intact and he was goal directed. He was characterized as a "diagnostic quandary at this point; however, the patient appears stable." He was retained at the CCCMS Level of Care. His GAF score was 58.[5] (Id. at 76-77.)

- On July 13, 2012, Petitioner was seen for a regularly scheduled appointment. He was not hearing voices and was able to communicate his needs effectively. He did not appear to be responding to internal stimuli and appeared to have a full range of emotions. His GAF score was 67. (Id. at 84.)

- On July 19, 2012, Petitioner underwent an IDTT meeting. He reported some depression. He was cooperative and oriented with good speech, affect and mood. He was able to answer questions accordingly and communicate his needs effectively. His thought process was within normal limits. He had no delusions or hallucinations. His GAF was 67. (Id. at 85-91.)

- On July 27, 2012, Petitioner was again evaluated. He had been off of medications for over one month. He denied hallucinations and delusions. He acknowledged his prior delusions and psychosis. He was oriented but embarrassed when talking about his prior behavior. His mood was euthymic and his affect was appropriate. His thinking was relevant and goal directed. His judgment and insight were intact. (Id. at 93.)

- On August 3, 2012, Petitioner was seen for a routine visit and reported doing "alright" overall. His affect was "off" as he appeared to smirk to hide his discomfort and depression. He denied auditory or visual hallucinations. He was responsive, oriented, and able to communicate his needs effectively. His GAF was 67. (Id. at 94-95.)

---

[5] In another location in the notes, the same clinician rated his GAF at 60. (Id. at 80.)

No further evaluations were conducted prior to the expiration of the limitations period.

### c.    After Expiration of Limitations Period

The limitations period expired on August 15, 2012. Petitioner filed his first state habeas petition on November 12, 2014. He filed the instant federal petition on May 19, 2015. During this period, the mental health records reflect that Petitioner's mental status generally continued to improve.

Between August 31, 2012 and December 19, 2012, Petitioner's GAF score ranged from 61 to 69. He was stable, responsive, oriented, and able to communicate his needs effectively. He did not appear to be responding to internal stimuli. (Id. at 96-103).

In 2013, Petitioner remained essentially stable. In the early part of the year, he was responsive, oriented, and able to communicate his needs effectively. He did not appear to be responding to internal stimuli. His GAF ranged from 55 to 67. His evaluation was entirely within normal limits. (Lodged Doc. 9.) In October 2013, he reported some anxiety and depression associated with family issues. Nonetheless, he did not have hallucinations, his thought process was normal, and his insight and judgment were fair. (Id. at 25.) His evaluations during the remainder of the year remained stable. (Id. at 26-32.)

In 2014, Petitioner continued to remain stable. His GAF ranged from 55 to 68. He continued to experience depression, some anxiety, and sleep disturbance, but his examinations were otherwise within normal limits. By April 2014, he was working full-time as a baker. In May 2014, he participated in a coordinated work stoppage as a deliberate act of protest. His clinician determined this was not the result of disorganized thought process or psychiatric symptoms. Throughout this time he reported to his clinicians that he was working on legal paperwork. In July 2014 he received an RVR for battery on an inmate. Again, the clinician noted this was a planned action, rather than the result of disorganized thought process caused by mental illness. In August 2014,

Petitioner requested to be removed from the CCCMS program. He also began refusing his remaining medication, which was intended to help with sleep disturbances and mood. Additionally, he refused to attend several appointments. He was to be considered for removal from the CCCMS level of care if symptom free for six months while off of medication. (Lodged Doc. 10.)

On January 8, 2015, Petitioner remained stable. His GAF was 65. He did not report hallucinations and his examination was essentially unchanged. He had been medication-free for six months. Accordingly, on March 18, 2015, Petitioner was discharged from the Mental Health Services Delivery System. This was his last mental health evaluation prior to filing the instant petition. (Lodged Doc. 11.)

### 3.   Discussion

A review of Petitioner's mental health records reveals that Petitioner suffered from serious mental health symptoms during the limitations period. In particular, at the beginning of the limitations period, Petitioner experienced intermittent auditory hallucinations. His diagnoses during this period included, at different points, schizoaffective disorder, mood disorder, depression, and possible PTSD. There is no question that Petitioner's symptoms were significant and required treatment. However, mental illness alone is insufficient to warrant equitable tolling. Petitioner must show that his mental impairment made it impossible to timely file his petition. Bills, 628 F.3d at 1100-01. In this regard, the mental health record before the Court does not support such a conclusion.

At the outset of the limitations period, Petitioner was not yet in the prison's Mental Health Services Delivery System. Following evaluation in December 2011, he was placed at the CCCMS level of care. He remained at the CCCMS level of care until he ultimately was discharged from the Mental Health Delivery System on March 18, 2015. Inmates designated to this level of care are those "whose symptoms are under control or in partial remission and can function in the general prison population, administrative

17

segregation, or segregated housing units." Coleman, 922 F. Supp. 2d at 903. Petitioner's treatment at the CCCMS level of care "suggests that petitioner was able to function despite his mental health problems." Washington v. McDonald, No. CV 09–2632–JVS (AJW), 2010 WL 1999469, at *2 (C.D. Cal. Feb. 19, 2010) (citing Coleman, 922 F. Supp. 2d at 903 n.24), report and recommendation adopted, 2010 WL 1999465 (C.D. Cal. Feb. 24, 2010).

Furthermore, Petitioner was nearly always assigned a GAF score within a functional range (with two exceptions, discussed below).[6] A GAF of 61–70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school function (e.g, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. A GAF of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers). A 41–50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in social, work, or school functioning. A GAF of 31–40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger

---

[6] The American Psychiatric Association has discontinued use of the GAF scale. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 16 (5th ed. 2013) (GAF scale dropped due to its "conceptual lack of clarity" and "questionable psychometrics in routine practice"). However, the Ninth Circuit has continued to look to GAF score as "a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Garrison v. Colvin, 759 F.3d 995, 1003 n. 4 (9th Cir. 2014) (finding that GAF scores are relevant to the social security disability assessment); see also Dowdy v. Curry, 617 Fed. Appx. 772 (9th Cir. 2015) (GAF score indicating "only moderate symptoms of impairment" did not support equitable tolling). In addition, other district courts in this circuit continue to consider GAF scores when determining whether a petitioner's mental state justifies equitable tolling. E.g., Reynaldo v. Arnold, No. 2:15-cv-2182-KJM-DBP, 2017 WL 3981602, at *7 (E.D. Cal. Sept. 11, 2017) (findings and recommendations pending); Peterson v. Hubbard, No. 2:15-cv-0689-KJM-KJN-P, 2017 WL 698280, at *14 (E.D. Cal. Feb. 21, 2017); Simon v. Uribe, No. 09-CV-05859-TEH, 2017 WL 3453327, at *4 (N.D. Cal. Aug. 11, 2017).

children, is defiant at home, and is failing at school.)" A GAF of 21–30 indicates: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed. 2004).

During the limitations period, Petitioner was assigned a GAF score between 55 and 67 on all but two occasions. These scores reflect only mild to moderate symptoms. While GAF scores are not dispositive, petitioner's moderate GAF scores are not consistent with a finding that he was so impaired that he could not understand the need to seek habeas relief and to take steps to seek such relief. See Lawrence v. Lizzaraga, No. 2:16–cv–0792 GEB AC P, 2017 WL 495774, at *4 (E.D. Cal. Feb. 7, 2017) (GAF score of 68 means petitioner's "mental faculties were within normal limits" and does not support equitable tolling); Davis v. Malfi, No. CV 06–4744–JVS (JEM), 2015 WL 1383776, at *3 (C.D. Cal. Mar. 20, 2015) (GAF scores between 60 and 70, with two scores of 53 and 55, among the court's reasons for finding no basis for equitable tolling based on mental incompetence); Sigmon v. Kernan, No. CV 06–5807 AHM (JWJ), 2009 WL 1514700, at *9 (C.D. Cal. May 27, 2009) (GAF scores between 55 and 66 "indicate only mild to moderate impairment" and do not provide a basis for equitable tolling); Lawless v. Evans, 545 F. Supp. 2d 1044, 1049 (C.D. Cal. 2008) (GAF score of 65 does not justify claim for equitable tolling due to mental incompetence).

The first occasion that Petitioner was assessed a lower GAF score – 45 – was on March 20, 2012. At that time, he reported hearing voices and feeling depressed and hopeless. However, by March 29, 2012, his score was assessed at 65 and his cognitive and behavior skills were intact. Additionally, immediately prior to his poor assessment, Petitioner had been evaluated on March 5, 2012 with a GAF score of 60. At that time he reported he had been reading and communicating with his family. He had recent

auditory hallucinations, but no perceptual disturbances and no indication of paranoia or delusions. In other words, this decline in Petitioner's functioning lasted at most 23 days – from March 6, 2012 to March 28, 2012. Petitioner was next assessed a GAF score of 45 on May 25, 2012. However, at that time, his thought process was linear and logical and without psychosis or delusions. By June 21, 2012, his GAF score was 58 and he was oriented, his speech was normal, his insight and judgment were fair, and his mood and thought processes were within normal limits. Thus, this episode of impairment lasted at most 83 days – from March 30, 2102 through June 20, 2012. Even assuming Petitioner is entitled to tolling for the 106 days in which he may have had lower functioning (a conclusion that is not necessarily supported by the narrative assessments during this period), this is insufficient to render the petition timely. As stated, the instant petition was filed more than two years after the expiration of the statute of limitations.

The Court also notes that Petitioner was repeatedly assessed to be alert and oriented, with linear thought processes and no cognitive impairment. One clinician noted that Petitioner's strengths included his ability to advocate for himself. During the limitations period Petitioner spent his time reading and communicating with family. He communicated appropriately with his clinicians. These behaviors do not suggest that Petitioner's mental health status inhibited his ability to timely file his habeas petition. And, although Petitioner experienced intermittent auditory hallucinations, this case differs from cases where such hallucinations or delusions were found sufficient to warrant equitable tolling. In Forbess v. Franke, 749 F.3d 837, 839 (9th Cir. 2014), the "unique" nature of the petitioner's delusions caused him to believe he had no need to file a federal habeas petition because he believed that he worked for the FBI, the FBI required him to lay low, and his work would result in his release. Petitioner in the present case had neither consistent delusions or hallucinations, nor any hallucinations that were noted to pertain to his legal status.

Finally, the Court notes that Petitioner's mental health status continued to improve

20

after the expiration of the limitations period. Petitioner held a full time job, discontinued his medical with the approval of his clinicians, and eventually was discharged from the Mental Health Services Delivery System. During this period, he also discussed with clinicians his intent to challenge his conviction. However, the records provided do not reflect that petitioner has or had a mental impairment so severe that he was unable to rationally or factually understand the need to timely file a petition or that he was rendered unable to file a petition. Rather, the records show that petitioner's functional impairment was moderate, at most, and his cognition has been intact throughout almost all of his incarceration. Further, and importantly, there is no indication in the record that petitioner's mental health previously made it impossible to file a timely petition but had improved in 2015 to the point he could do so. Rather, petitioner's diagnoses appear fairly consistent over the course of his incarceration. Based on the court's review of petitioner's mental health records, and based on this district court's limited resources and time, this court does not find an evidentiary hearing is required to make a determination of petitioner's mental competence. The existing record is sufficient to conclude that petitioner had the mental capacity to understand the need to timely file a petition and to effectuate its filing. However, he took no efforts in this regard for more than two years. Thus, even if Petitioner's mental illness was so severe as to meet the first prong of Bills, he has not shown diligence in pursuing his claims. Bills, 628 F.3d at 1100 (holding that the petitioner "must diligently seek assistance and exploit whatever assistance is reasonably available").

Petitioner does not adequately address the concerns raised herein. His opposition to the motion to dismiss is focused largely on his underlying claims and addresses the limitations period only in passing.[7] (ECF No. 52.) He appears to contend that the records provided by defendant do not accurately reflect his mental health status. He states that he has journal entries that reflect that his mental health was in consistent decline during

---

[7] Petitioner also argues that his confinement is unlawful because there is no True Bill in Commerce to hold him. He cites no authority in support of this proposition, and the Court finds none.

1 and after the relevant period and that he merely stopped his medication and exited the
2 mental health system for political reasons. However, his decisions to stop medication
3 and exit the mental health program were approved by numerous providers. Petitioner's
4 contention that he manipulated the system by pretending to be more competent than he
5 truly was is not supported by the record and, in any event, would reflect a level of
6 sophistication that belies a claim that mental impairment prevented him from timely filing
7 this petition.

8      Accordingly, Petitioner is not entitled to equitable tolling based on mental
9 impairment.

10      **E.    Equitable Tolling Based on Lack of Trial Record**

11      Petitioner claims that he was unable to timely file his petition due to lack of access
12 to his legal records from the trial counsel.

13      Denial of access to legal files may, in some cases, constitute an "extraordinary
14 circumstance" beyond a petitioner's control for purposes of justifying the application of
15 equitable tolling to the AEDPA statute of limitations. See Chaffer v. Prosper, 592 F.3d
16 1046, 1049 (9th Cir. 2010); see also Waldron–Ramsey v. Pacholke, 556 F.3d 1008,
17 1013 (9th Cir. 2009); Espinoza–Matthews v. California, 432 F.3d 1021, 1027-28 (9th Cir.
18 2005). In order to demonstrate that the inability to obtain state court records constituted
19 extraordinary circumstances justifying equitable tolling, Petitioner must show that "the
20 extraordinary circumstances were the cause of his untimeliness." Bryant v. Ariz. Atty.
21 Gen., 499 F.3d 1056, 1061 (9th Cir. 2007) (citation omitted); Waldron–Ramsey, 556 F.3d
22 at 1013 (petitioner bears the burden of showing that the "hardship caused by lack of
23 access to his materials was an extraordinary circumstance that caused him to file his
24 petition almost a year late").

25      Here, petitioner has failed to show that his legal records were required to present
26 his claims, or that his lack of access to such records precluded him from pursuing
27 habeas relief or otherwise caused the untimeliness of the instant petition and made a

28

timely filing impossible. As an initial matter, the Court notes that the records Petitioner relies on in support of his claim are not legal records, but medical records relating to his detention in County jail and the time period preceding the offense. Petitioner does not explain how any document in his legal files is crucial to his claims, and the facts at issue regarding Petitioner's competence were known to Petitioner. See Hebert v. Marshall, 415 Fed. Appx. 818, 819 (9th Cir. 2011) (petitioner not entitled to equitable or statutory tolling based on claim that documents necessary to his petition were allegedly withheld from him because he did not point to any document that was withheld and that created an "impediment" to his ability to file a timely petition). Accordingly, petitioner has failed to establish that the inability to obtain his state court records was an extraordinary circumstance that caused his untimeliness. Additionally, Petitioner has failed to establish that he was pursuing his rights diligently. Petitioner did not attempt to obtain his records until September 2013, more than a year after the limitations period expired.[8] (ECF No. 25 at 28.)

As such, petitioner has failed to show that he is entitled to equitable tolling on this basis.

### F.  Equitable Tolling Based on Lack of Access to Law Library

Petitioner argues that his yard was "sporadically" on lockdown during July 2012 through July 2013, and that he was denied access to the law library for what amounted to a total of six months. (ECF No. 25 at 28.) He also claims that his placement in administrative segregation from July 26, 2014, until October 1, 2014, resulted in his inability to access his legal property for a thirty-five day period, possibly during August 2014. (ECF No. 25 at 29.)

In general, a prisoner's inability to access the prison law library for limited periods

---

[8] The parties dispute whether trial counsel previously provided Petitioner with the records, and whether trial counsel's statement that he did so is credible. This dispute does not affect the Court's analysis. Either Petitioner had the records at an earlier date and failed to maintain possession of them, or Petitioner did not receive the records and did not again attempt to seek the records until September 2013. Either circumstance forecloses a conclusion that Petitioner acted with the diligence that would entitle him to equitable tolling.

of time is not an extraordinary circumstance that warrants equitable tolling. E.g., Ramirez v. Yates, 571 F993, 998 (9th Cir.2009) Here, Petitioner contends that he was on lockdown and unable to access the law library for a total of six non-consecutive months. At most, 1.5 of these months occurred during the limitations period, at the very conclusion of that period. During that time, Petitioner had the ability to utilize a paging service to request legal materials from law library staff. (Lodged Doc. 12 at 5.) Thus, he has not shown that any lock downs made it impossible to timely file his petition.

Additionally, the thirty-five day period in which he was prevented from accessing his legal materials occurred well after the statute of limitations had run. It therefore is not relevant to the Court's tolling analysis.

Petitioner is not entitled to equitable tolling on this basis.

**G.     Actual Innocence Exception to the Statute of Limitations**

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." McQuiggin v. Perkins, 569 U.S. 383, 386 (2013). Thus, "a petitioner is not barred by the AEDPA statute of limitations from filing an otherwise untimely habeas petition if the petitioner makes a credible showing of 'actual innocence' under Schlup v. Delo." Lee v. Lampert, 653 F.3d 929, 945 (9th Cir. 2011) (citing Schlup, 513 U.S. 298 (1995)). To pass through the "Schlup gateway" a petitioner must present evidence of innocence so strong that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup, 513 U.S. at 327; see also McQuiggin, 569 U.S. at 384. "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." McQuiggin, 569 U.S. at 386 (citing Schlup, 513 U.S. at 329); see also House v. Bell, 547 U.S. 518, 538 (2006) (emphasizing that the Schlup standard is demanding and seldom met).

The petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." <u>Schlup</u>, 513 U.S. at 324. In the few cases where a petitioner has qualified for an actual innocence exception, the new evidence typically consisted of "credible evidence that the petitioner had a solid alibi for the time of the crime, numerous exonerating eyewitness accounts of the crime, DNA evidence excluding the petitioner and identifying another potential perpetrator, a credible confession by a likely suspect explaining that he had framed the petitioner, and/or evidence contradicting the very premise of the prosecutor's case against the petitioner." <u>Stidham v. Cate</u>, Case No. 10-CV-0120-GAF, 2010 WL 5463795, at *8 (C.D. Cal. Oct. 28, 2010) (collecting cases).

The Court previously rejected Petitioner's actual innocence claim as follows:

> Petitioner asserts that he is actually innocent because of the alleged ineffectiveness of his trial counsel. (Opp'n at 2-4.) Petitioner's claims, without further explanation, do not undermine his guilt. Petitioner has not described any new evidence, or why that evidence establishes his factual innocence. The evidence presented in the opposition simply is not sufficient to support a finding of actual innocence. Petitioner's new evidence, if presented to a reasonable juror, would not convince the juror of his innocence. Petitioner's actual innocence claim is without merit.

(ECF No. 31.)

Petitioner now attempts to clarify his claim of actual innocence. As best the Court can discern, Petitioner claims that he was incompetent and/or insane at the time he committed the offense but believed at that time he was acting in self-defense.[9] Thus, he contends, he should have been afforded the defense of imperfect self-defense, which would have mitigated his crime. Because his counsel failed to investigate the victim's

---

[9] Petitioner also appears to argue that he was not competent to stand trial or enter a plea. However, he does not present any evidence regarding his competency at the time trial commenced or at the time he entered his plea. Clinical notes written approximately one month before Petitioner entered his plea suggest that his symptoms were being controlled with medication. (ECF No. 25-1 at 84.)

history of violence toward Petitioner, the basis for this claim of imperfect self-defense was not uncovered prior to trial or presented to the court.

Petitioner's claim does not support a finding of actual innocence.

Under California law, the defense of imperfect self-defense "is available to California defendants who have a genuine, albeit unreasonable, fear of imminent death or great bodily injury." Menendez v. Terhune, 422 F.3d 1012, 1023 (9th Cir. 2005) (citing In re Christian S., 7 Cal.4th 768, 771, 30 Cal.Rptr.2d 33, 872 P.2d 574 (1994)). "A defendant who kills with this genuine but unreasonable fear can be found guilty of no more than manslaughter." Id. Thus, "imperfect self-defense is not a complete defense to homicide[.]" DePetris v. Kuykendall, 239 F.3d 1057, 1058–59 (9th Cir. 2001). Nor is the allegation of imperfect self-defense evidence that Petitioner did not engage in the conduct of which he was accused. See Calderon v. Thompson, 523 U.S. 538, 559 (1998) ("[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence.") (quoting Sawyer v. Whitley, 505 U.S. 333, 339 (1992)). The evidence presented would not convince a reasonable juror of Petitioner's innocence.

Accordingly, Petitioner is not entitled to an exception to the statute of limitations on this ground.

## III.   Petitioner's Motions

The Court now turns to Petitioner's motions: a motion for transcripts (ECF No. 51), a motion for expedited review (ECF No. 57), a motion for default judgment (ECF No. 62), and a motion for ruling on his previously filed motions (ECF No. 68).

### A.   Evidentiary Hearing

Petitioner has filed two motions for an evidentiary hearing. (ECF Nos. 66, 69.) The motions appear to seek an evidentiary hearing in relation to the merits of his claims. Thus, they should be denied as moot because the Court cannot reach the merits of the petition.

To the extent Petitioner seeks an evidentiary hearing in relation to his claim of mental impairment for equitable tolling purposes, the request should be denied. The record is sufficiently developed to conclude that Petitioner's mental illness was not so severe as to cause the untimely habeas petition. An evidentiary hearing is not required. See Roberts v. Marshall, 627 F.3d 768, 773 (9th Cir. 2010)).

**B.    Appointment of Expert**

Petitioner seeks the appointment of a forensic psychiatric expert (ECF No. 50) and a crime scene forensic expert (ECF No. 53). These requests pertain primarily to the merits of his claim. Again, because the Court cannot reach the merits of the petition, these requests should be denied.

Petitioner also contends that expert psychiatric opinion is required to interpret the mental health records presented by Respondent. (ECF No. 50.) As stated, however, the Court has reviewed the records in detail and determined that the present record is sufficient to deny Petitioner's claim of equitable tolling. Accordingly, the request also should be denied.

**C.    Appointment of Counsel**

Petitioner has field repeated motions requesting the appointment of counsel. (ECF Nos. 49, 50, 51, 54.) The undersigned previously suggested that appointment of counsel may be warranted in this action:

> The Court has not made a determination as to whether Petitioner is entitled to equitable tolling. Should Respondent choose, he may file a renewed motion to dismiss addressing equitable tolling issues upon expanding the record by way of discovery or even an evidentiary hearing.  See Rules 6-8 of the Rules Governing Section 2254 Cases. However, it may be that significant evidence, possibly including expert witness evidence, will be required to determine such issues. Additionally, due to the complexity of such a determination, the Court would likely find it appropriate to appoint Petitioner counsel to assist in presenting the tolling defense based on technical mental health assessments.

(ECF No. 31 at 11-12.)

There currently exists no absolute right to appointment of counsel in habeas proceedings. See, e.g., Anderson v. Heinze, 258 F.2d 479, 481 (9th Cir. 1958); Mitchell v. Wyrick, 727 F.2d 773, 774 (8th Cir. 1984). However, 18 U.S.C. § 3006A authorizes the appointment of counsel at any stage of the case "if the interests of justice so require." See Rule 8(c), Fed. R. Governing § 2254 Cases. Although the Court previously suggested that appointment of counsel may be appropriate, the court now finds that the interests of justice do not require the appointment of counsel at the present time. As stated above, the motion to dismiss may be decided upon the present record. No expert opinion or evidentiary hearing is required. The Court does not find the appointment of counsel appropriate at this time and will therefore recommend that the motions for appointment of counsel be denied.

### D. Transcripts and Discovery

Petitioner requests that transcripts be ordered from his court appearances in the underlying criminal proceedings in Kings County Superior Court. He also requests other discovery relating to the proceedings. (ECF No. 51.) He states that the transcripts and discovery are required to address the merits of his petition and his claim of actual innocence.

The Court has determined that it cannot reach the merits of Petitioner's petition because it is time-barred. Furthermore, even if the Court could review the petition, the Court's initial review is limited to the record before the state court. See Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Accordingly, discovery is not appropriate at this stage of the proceedings, and the motion for transcripts and discovery (ECF No. 51) should be denied.

///

///

///

**E.  Default**

Petitioner has filed a motion for "default of judgment."[10] (ECF No. 62.) The purpose of the motion is unclear. Petitioner appears to argue that Respondent's request for an extension of time to reply to Petitioner's opposition to the motion to dismiss was filed after the expiration of the deadline. However, it appears that Respondent's deadline fell on a Saturday and thus was continued to the following Monday, making Respondent's representation correct. Regardless, however, the Court subsequently granted Respondent an extension of time to August 9, 2017, and Respondent's reply was timely filed on that date. (ECF Nos. 59, 63.) There is therefore no merit to Petitioner's argument. The motion should be denied.

**F.  Motions for Ruling**

Petitioner filed a motion seeking expedited priority review of his petition. (ECF No. 57.) As the Court has herein determined that it cannot reach the merits of the petition, this motion is moot. On that basis, it will be denied.

Petitioner also filed a motion seeking a ruling on his previously filed motions. (ECF No. 68.) As all of Petitioner's motions are addressed herein, the motion will be granted.

**IV.  Conclusion, Order, and Recommendation**

Petitioner's motion for ruling (ECF No. 68) is HEREBY GRANTED to the extent his motions are addressed herein. His motion for expedited priority review (ECF No. 57) is HEREBY DENIED.

Additionally, it is HEREBY RECOMMENDED that:

1.  Respondent's motion to dismiss (ECF No. 45) be GRANTED;

2.  The petition be dismissed as time-barred;

3.  Petitioner's motions for the appointment of counsel (ECF Nos. 49, 50, 51, 54) be DENIED;

---

[10] In the same submission, Petitioner adds further argument to his opposition. These arguments are addressed above in the section of this order addressing the motion to dismiss.

4. Petitioner's motions for the appointment of experts (ECF Nos. 50, 53) be DENIED;

5. Petitioner's motion for transcripts (ECF No. 51) be DENIED;

6. Petitioner's motion for default judgment (ECF No. 62) be DENIED; and

7. Petitioner's motions for evidentiary hearing (ECF Nos. 66, 69) be DENIED.

The findings and recommendation are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **thirty** (30) days after being served with the findings and recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   January 29, 2018      /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE

.